[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14487
_____

D.C. Docket No. 5:15-cv-00247-MTT

EVANSTON INSURANCE COMPANY,

Plaintiff - Appellee,

versus

SANDERSVILLE RAILROAD COMPANY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(February 8, 2019)

Before WILSON and JORDAN, Circuit Judges, and GRAHAM,[*] District Judge.

GRAHAM, District Judge:

---

[*] Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

Sandersville Railroad Company was sued by an employee who developed an occupational disease known as welder's lung.  Sandersville in turn notified Evanston Insurance Company of a claim under its Commercial General Liability Policy.  Evanston then filed suit, seeking declaratory judgment that a pollution exclusion clause to the Policy excluded coverage of the welder's lung claim.  The district court granted summary judgment to Evanston on the coverage issue.  After review and with the benefit of oral argument, we affirm.

## I.

Sandersville operates a short line railroad in Georgia.  Employee John Flowers worked as a rail carman for twenty-two years, maintaining a fleet of rail cars and spending much of his time welding.  In 2012 doctors diagnosed Flowers with a lung disease called siderosis, or welder's lung.  Flowers made a claim to Sandersville in January 2013 and later brought suit under the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq*.  He alleged that his disease was caused by occupational exposure to welding fumes containing iron—an allegation that neither Sandersville nor Evanston dispute.

Evanston issued the Commercial General Liability Policy to Sandersville for the period of September 1, 2012 to September 1, 2013.[1]  The Policy contains numerous forms and endorsements, including a Premier Railroad Liability

---

[1] The original insurer was Essex Insurance Company, which merged into Evanston in 2016.

Coverage Form.  The Form has an "Insuring Agreement" under which Evanston agreed to cover "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  The Form defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death . . . ."

The Form contains a list of exclusions.  One is for "Employer's Liability," which excludes coverage for bodily injury to an employee of the insured "arising out of and in the course of [e]mployment by the insured."  But the exclusion "does not apply to . . . liability imposed on [the insured] by the Federal Employers' Liability Act."  The Form defines its reference to FELA as regarding "injury to 'employees' in the course of their employment, including occupational disease."

Another exclusion is for "Pollution."  It excludes coverage for bodily injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"  The terms "discharge, dispersal, seepage, migration, release or escape" are not defined.  The term "pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

When notified of the Flowers claim, Evanston issued a reservation of the right to decline coverage based on the pollution exclusion.  After Sandersville later

3

settled the Flowers claim without contribution from Evanston, Evanston filed this diversity action seeking a declaratory judgment.

The district court held that the pollution exclusion barred coverage. The court interpreted Georgia case law as broadly applying similar pollution exclusion clauses beyond traditional environmental pollution claims. The court found as a matter of law that siderosis resulting from the inhalation of welding fumes qualified as an injury arising out of the release, escape or dispersal of a pollutant.

## II.

Sandersville appeals the district court's interpretation of the Policy. The district court determined the meaning of the Policy based on the contract language alone and did not look to extrinsic evidence or make factual findings. We thus review the district court's interpretation of the insurance contract *de novo*, applying the same summary judgment standards as the district court. *United Benefit Life Ins. Co. v. U.S. Life Ins. Co.*, 36 F.3d 1063, 1065 (11th Cir. 1994); *Blake v. Am. Airlines, Inc.*, 245 F.3d 1213, 1215 (11th Cir. 2001).

## III.

Georgia law governs our interpretation of the Policy. *See Employers Mut. Cas. Co. v. Mallard*, 309 F.3d 1305, 1307 (11th Cir. 2002). We look "first to the text of the policy itself" and give words "their 'usual and common' meaning." *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 784 S.E.2d 422, 424

4

(2016) (quoting O.C.G.A. § 13-2-2(2)).  "Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured."  *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90, 92 (2008) (footnote omitted).  But when "a policy provision is susceptible to more than one meaning, . . . [it] will be construed strictly against the insurer/drafter and in favor of the insured."  *Georgia Farm Bureau*, 784 S.E.2d at 424–25.

Applying the Georgia Supreme Court's decisions in *Reed* and *Georgia Farm Bureau* to the case at hand, we find that the Policy's pollution exclusion clause unambiguously excludes coverage of the Flowers welder's lung claim.  In *Reed*, a tenant had sued her landlord "for carbon monoxide poisoning allegedly caused by the landlord's failure to keep the rental house in good repair."  667 S.E.2d at 91.  The landlord's commercial general liability policy contained a pollution exclusion clause with language identical to the one here.  The Georgia Supreme Court rejected the argument that the clause applied only to traditional environmental pollution—"Nothing in the text of the pollution exclusion clause supports such a reading."  *Id*. at 92.  The Court held that exposure to carbon monoxide fell within the pollution exclusion because the gas was an "'irritant or contaminant,' including 'fumes'" under the policy.  *Id*. (quoting policy language).

5

In *Georgia Farm Bureau*, the Georgia Supreme Court again considered a commercial general liability policy with a pollution exclusion identical to the one here. The case stemmed from a tenant's claim against a landlord for injuries caused by exposure to deteriorating lead-based paint. The Court described the pollution exclusion as "absolute," covering exposure to "*any* pollutant" and not limited in any way to "industrial," "environmental" or "toxic" forms of pollution. 784 S.E.2d at 425 (emphasis in original). It then held that "lead present in paint unambiguously qualifies as a pollutant"; thus, injuries arising from the inhalation or ingestion of lead-based paint were excluded. *Id*. at 426.

We find no basis on which to distinguish the Flowers claim from the ones in *Reed* and *Georgia Farm Bureau*. Flowers alleged that his injury arose from inhaling welding fumes, which contained iron particles. Under the Policy's absolute pollution exclusion, welding fumes unambiguously qualify as an "irritant or contaminant, including . . . fumes."

Sandersville argues that the Georgia Supreme Court's approach ignores the policies' movement terms. That is, even if welding fumes, carbon monoxide and lead-based paint are pollutants, Sandersville contends that the exclusion clauses are not satisfied unless the pollutants led to injury through their discharge, dispersal, seepage, migration, release or escape.

6

In support, Sandersville relies on this Court's decision in *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335 (11th Cir. 1996).  There, an individual allegedly died from fumes he inhaled while using an adhesive product to install carpet.  The commercial general liability policy at issue contained a pollution exclusion that is nearly the same as the one here, minus the "seepage" and "migration" terms.  The Court held that the emission of vapors from the adhesive did not satisfy the meaning of either a discharge (which the Court defined as an "unloading"), dispersal (a "distribution"), release (a "liberating" from restraint) or escape (an "evasion of or deliverance from what confines").  *Id*. at 338.  The Court thus concluded that the pollution exclusion did not apply to deny coverage of the claim.  *Id*. at 338–39.

The legal landscape has changed since *Bituminous*.  The Court's reasoning reflected a traditional view of the scope of pollution exclusion clauses.  *See id*. at 339 (stating that the exclusion clause contemplated "environmental contamination," and rejecting a broader application to consumer claims).  And the Court was guided by the rule of resolving ambiguities in favor of the insured.  *See id*. at 338 (citing *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989) in selecting "unloading" over "emission" as the operative definition of "discharge").

The Georgia Supreme Court in *Reed* expressly rejected a limited view of pollution exclusion clauses. It did so over a dissent arguing that extending those clauses to situations "no reasonable insured would have envisioned" ran afoul of the rule of construing insurance policies in favor of coverage. *Reed*, 667 S.E.2d at 92, 92–93 (Hunstein, P.J., dissenting). The Court reaffirmed its approach in *Georgia Farm Bureau* and held that a clause identical to the one here is unambiguous. Canons of interpretations used to resolve an ambiguity simply do not apply.

In *Reed* and *Georgia Farm Bureau*, the injured parties alleged that their injuries resulted respectively from the release of carbon monoxide and from the inhalation and ingestion of lead paint. The Court in both instances held that the pollution exclusion clauses unambiguously applied to the factual scenarios being presented. We must follow suit, as the factual scenario here—lung disease caused by the inhalation of fumes released by welding—falls within the terms of the pollution exclusion. *See also Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 824–25 (4th Cir. 1998) (holding that a nearly identical pollution exclusion clause barred coverage for injury caused by the inhalation of manganese fumes released by welding). To the extent *Bituminous* suggests a different result, it must give way. *See World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009) ("[W]e follow the latest statement of state law by

8

the state supreme court."); *United States v. Johnson*, 528 F.3d 1318, 1320 (11th Cir. 2008); *Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066 (11th Cir. 1996).

Sandersville contends that a broad construction of the pollution exclusion is at odds with the FELA exception found in the exclusion for employer's liability. Sandersville purchased "premier" railroad coverage and believes it had reason to expect that coverage for FELA liability was part of what it paid for.

The insured's reasonable expectations come into play only when contractual language is ambiguous. *See Racetrac Petroleum, Inc. v. Ace Am. Ins. Co.*, 841 F. Supp. 2d 1286, 1296 (N.D. Ga. 2011) (citing Georgia cases). The parties chose not to place a FELA exception in the pollution exclusion clause, and the inclusion of a FELA exception elsewhere does not create an ambiguity. The Policy contains no language providing that when a claim for coverage survives one exclusion, it is excused from examination under the rest. That the welder's lung claim withstands the employer's liability exclusion does not entitle it to avoid scrutiny under the pollution exclusion. *See Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1327 (11th Cir. 2013) ("[T]hat is the nature of an exclusion—to exclude things that otherwise would be covered, when certain conditions are met."); *Columbia Cas. Co. v. Georgia & Florida Railnet, Inc.*, 542 F.3d 106, 113 (5th Cir. 2008) (rejecting the argument that the existence of a FELA exception to other exclusions

9

negated the application of a pollution exclusion to a railroad worker's claim for

respiratory damage caused by his inhalation of exhaust and dust fumes).

## IV.

The district court's grant of summary judgment to Evanston on the issue of

coverage is therefore **AFFIRMED.**

JORDAN, Circuit Judge, concurring in the judgment:

In my opinion, the Georgia Supreme Court's decisions in *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90 (Ga. 2008), and *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422 (Ga. 2016), did not completely abrogate our decision in *Bituminous Cas. Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335 (11th Cir. 1996). Nevertheless, I concur in the judgment.

It is true that *Reed*, 667 S.E.2d at 91-92, and *Smith*, 784 S.E.2d at 424-26, both generally rejected a narrow reading of pollution exclusions, but they did so only in the context of deciding whether the definition of "pollutant" in a given exclusion was ambiguous and, if not, whether a certain substance constituted a "pollutant." *See Reed*, 667 S.E.2d at 92 ("As all parties recognize, the question thus narrows to whether carbon monoxide gas is a 'pollutant'—i.e., matter, in any state, acting as an 'irritant or contaminant,' including 'fumes.'"); *Smith*, 784 S.E.2d at 426 ("Under the broad definition contained in Chupp's policy, we conclude that lead present in paint unambiguously qualifies as a pollutant and that the plain language of the policy's pollution exclusion clause thus excludes Smith's claims against Chupp from coverage."). One of our holdings in *Advanced Adhesive* was that the "emission" of chemical vapors from the defendant's product was not unambiguously excluded from coverage under the relevant policy because the terms "discharge," "dispersal," "release," and "escape" were ambiguous. We explained that the term "discharge"

11

had more than one reasonable meaning, and that the terms "dispersal," "release," and "escape" did not "precisely describe the chemical process in controversy." 73 F.3d at 338. That precise issue was not presented in *Reed* or *Smith*, and as a result I disagree with the majority that those cases left *Advanced Adhesive* in the dust.

I would affirm the district court's grant of summary judgment in favor of Evanston Insurance Company on a narrower ground. The pollution exclusion in Sandersville Railroad's policy excludes injuries caused by the "discharge, dispersal, seepage, migration, release, or escape" of "pollutants," which are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, alkalis, chemicals and waste." Because the term "migration," as far as I can tell, was not present in the exclusion addressed in *Advanced Adhesive*, that case does not control here. In my view, welding fumes containing iron constitute a "pollutant" (as that term is defined in the policy), and it is fair to say that such fumes "migrated," i.e., they "[m]ove[d] from one place to another." 1 Shorter Oxford English Dictionary 1774 (5th ed. 2002). That is, after all, what fumes normally do.